UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION


BELINDA LAYSSARD STOKES,[1]         CIVIL ACTION
          Appellant                NO. CV08-1952-A

VERSUS

MICHAEL J. ASTRUE,                 JUDGE DEE D. DRELL
          Appellee                 MAGISTRATE JUDGE JAMES D. KIRK



REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE


     Before the court is an appeal from a ruling by the Social
Security Administration filed by Belinda Layssard Stokes
("Stokes")on December 15, 2008 (Doc. 1).

     Stokes filed an application for disability income benefits
("DIB") and supplemental security income ("SSI") on July 23, 2007,

---

[1] Stokes' name is set forth incorrectly throughout the
docket sheet.  Stokes' attorney incorrectly put her name as
"Linda Layssard-Stokes" on most of the pleadings and other
paperwork.  However, Stokes' financial affidavit (Doc. 3), filled
out by hand and signed by Stokes, as well as the administrative
hearing transcript (Tr. pp. 16-38), the social security
applications (Tr. pp. 43, 75), and the medical records, make it
clear that her first name is "*Belinda*" and her last name is *not*
hyphenated with her maiden name.

alleging a disability onset date of March 28, 2005 (Tr. pp. 75, 83).   Those applications were denied by the Social Security Administration ("SSA") (Tr. pp. 41, 43).

A de novo hearing was held before an administrative law judge ("ALJ") on May 8, 2008 (Tr. p. 16), at which Stokes appeared with her attorney and a vocational expert ("VE").   The ALJ found that, although Stokes suffers from severe impairments of hepatitis C, degenerative disc disease of the cervical spine, status post fractured left femur, anxiety, and depression, she does not have an impairment or combination of impairments that meet or medically equal a listed impairment, she has the residual functional capacity to perform a limited range of sedentary work, and she can perform her past relevant work as a security clerk (Tr. pp. 11-15).   The ALJ concluded that Stokes was not under a disability as defined in the Social Security Act at any time through the date of his decision on August 8, 2008 (Tr. p. 15).

Stokes requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Stokes next filed this appeal for judicial review of the Commissioner's final decision.   The sole ground for relief raised in Stokes' brief (Doc. 9) is whether, at Step 4, the ALJ erred in failing to accord proper weight to the opinions of the treating and

examining physicians, resulting in a residual functional capacity assessment that was unsupported by substantial evidence.

The Commissioner filed a brief in response (Doc. 10), to which Stokes filed a reply (Doc. 11).  Stokes' appeal is now before the court for disposition.

<u>Eligibility for Benefits</u>

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a).  Eligibility is dependent upon disability, income, and other financial resources.  42 U.S.C. 1382(a).  To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months.  Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy.  42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that

has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. 423 (d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C.423(d)(2).

<u>Summary of Pertinent Facts</u>

At the time of her May 2008 administrative hearing, Stokes was 47 years old (Tr. p. 19), had a high school education (Tr. p. 19), and had past relevant work as a security clerk (monitoring electrical and pipe supplies for Proctor and Gamble during the construction of a power plant) (Tr. p. 20), and working for a retail hardware company (Tr. p. 20).

Stokes was evaluated by the Mental Health Center of Central Louisiana in January 2004, diagnosed with major depression, recurrent and severe, and anxiety at Axis I, a personality disorder at Axis II, arthritis at Axis III, and a GAF of 65,[2] and she was

---

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revised</u>, pp. 25-35 (4th ed. 2000) ("<u>DSM-IV-TR</u>").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  <u>Diagnostic and Statistical Manual of Mental Disorders, Text Revised</u>, pp. 25-30 (4th ed. 2000) ("<u>DSM-IV-TR</u>").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a

prescribed Zoloft and Vistaril (Tr. p. 144).  The clinic lost contact with Stokes and was unable to evaluate her on discharge (Tr. p. 144).

In May 2004, Stokes was involved in a moving vehicle accident and sustained injuries to her head, neck, and both shoulders, and

---

subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors, not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information.  DSM-IV-TR, at 34.  Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

was diagnosed with cervical strain, and lacerations to her upper eyelid and scalp (Tr. pp. 157-158).

Dr. Heather Guillot, a family medicine doctor, began treating Stokes in 2005 for severe anxiety due to domestic abuse; she diagnosed traumatic shock syndrome and noted Stokes had been to multiple counseling centers and Central State Hospital in the past (Tr. p. 156). Dr. Guillot stopped Stokes' Ativan prescription and began a trial of Xanax (Tr. p. 155). In June 2005, Dr. Guillot continued Stokes' Xanax and added Elavil as adjunct therapy as well as Prevacid for gastritis (Tr. p. 154). In July 2006, Dr. Guillot diagnosed Stokes with hepatitis C, as well as arthritis, and anxiety (Tr. pp. 145-153). Stokes was prescribed Xanax and Mobic, and was referred to a clinic in Baton Rouge (Tr. p. 146).

In August 2006, Stokes began going to the LSU Medical Center for evaluation of her hepatitis C (Tr. pp. 169-171). In September 2006, Dr. Guillot diagnosed restless leg syndrome, hot flashes, anterior neck pain, Hepatitis C, and post-traumatic stress disorder, and prescribed Clonidine Hcl, Elavil, Mobic, and Xanax, and noted Stokes was waiting to hear from Dr. Balart in Baton Rouge to see whether she was a candidate for chemotherapy (Tr. pp. 186-187). In August 2007, Stokes was told that interferon/ribavirin therapy was not recommended at that time due to her anxiety and stress issues (Tr. p. 189).

In October 2006, Stokes underwent a psychologic examination

with Dr. James W. Quillin, Ph.D., a psychologist (Tr. p. 165).  Dr. Quillin found Stokes was substantially depressed, appeared to have post-traumatic features, was prone to atypical panic attacks and hyper-startle responses during which she held her breath, and generalized anxiety.  Dr. Quillin also noted Stokes' serious medical problem of hepatitis C (Tr. p. 165).  Stokes' mental status examination showed she was anxious and obviously depressed, but she was able to understand and follow simple directions and instructions without difficulty, her reading recognition capacity was at the high school grade level, she could perform simple arithmetic operations, and her intellectual functions appeared to be within normal limits on a gross clinical basis (Tr. p. 166).

In December 2006, Stokes was evaluated by Dr. Michael Ellerbe. X-rays showed reversed lordosis of the cervical spine and narrowing of joint spaces from C4-C7 representing degenerative joint disease in the cervical spine, and some narrowing of L4-L5 representing degenerative joint disease in the lumbosacral spine (Tr. p. 174). Dr. Ellerbe diagnosed anxiety, depression, hypertension, and hepatitis C, found her gait was normal, found no spasm, neurological defects or atrophy, full range of motion throughout, no swelling in her hands, knees, or feet, and normal grip strength, dexterity, and grasping ability.  Dr. Ellerbe noted Stokes' complaints of pain and documented hepatitis C, depression, anxiety, history of a broken femur, and history of cervical fracture (Tr.

pp. 174-176).  Dr. Ellerbe stated that, due to Stokes' complaints of pain, he believed she may have difficulty with sitting, walking, and/or standing for a full workday, and lifting/carrying objects of at least 20 pounds, but should be able to hold a conversation, respond appropriately to questions, and carry out and remember instructions (Tr. p. 174).

Stokes was treated at the Alexandria Family Medicine Clinic in August 2007 for anxiety and pain in her extremities (Tr. pp. 185).  Dr. Alan Fortier diagnosed restless leg syndrome, anxiety, arthralgia, and gastroesophageal reflux disease, and prescribed Pepcid, Mobic, Requip, Xanax, Amitriptyline HCL, and Clonidine (Tr. pp. 182-185).

In October 2007, a psychiatric review technique form was filled out by psychologist Julia Doolin, Ph.D. (Tr. pp. 201-218, 236).  Dr. Doolin stated that Stokes suffers from depression with no particular symptoms (Tr. p. 204), and anxiety with recurrent and intrusive recollections of a traumatic experience which are a source of marked distress (Tr. p. 206).  Dr. Doolin also found that Stokes has a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. p. 211), and moderate limitations in the ability to understand and remember detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to interact

8

appropriately with the general public (Tr. pp. 215-216).  Dr. Doolin noted that Dr. Quillin's 2006 mental status assessment of Stokes predated her recent treatment and medication (Tr. p. 217).

Stokes had an orthopedic evaluation in October 2007 by Dr. J. David DeLapp, an orthopedist, who noted she had sustained C5, C6, and C7, a left femur fracture in a 1996 accident, and still had severe neck pain (Tr. p. 219).  Dr. DeLapp found severe degenerative changes in C5, C6, and C7 with evidence of grade 1 anterior spondylolisthesis at all three levels and no impingement (Tr. p. 220).  Dr. DeLapp found that Stokes can lift or carry up to ten pounds occasionally, sit up to eight hours at a time, stand up to one hour at a time, walk up to one hour at a time, sit up to eight hours in an eight hour work day, stand up to one hour in an eight hour day, and walk up to one hour in an eight hour day (Tr. p. 220).  Dr. DeLapp also found that Stokes cannot reach overhead, can push or pull only occasionally, can frequently feel, finger, handle, or reach other than overhead, can operate foot controls continuously on the right and frequently on the left, can occasionally climb stairs and ramps, and can never climb ladders and scaffolds, and never balance, stoop, kneel, crouch, or crawl (Tr. pp. 220-221).

From October 2007 through May 2008, Stokes underwent psychological counseling for worsening post-traumatic stress disorder with Dr. George J. Haag, a psychologist (Tr. pp. 245-255,

267-278, 286-289).

In May 2008, Dr. Haag evaluated Stokes' symptoms and found Stokes had marked restrictions of activities of daily living, marked difficulty in maintaining social functioning, deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner, repeated episodes of deterioration or decompensation in work-like settings, and a GAF of 60 [3] (Tr. p. 260).  Dr. Haag further found Stokes is extremely impaired in her ability to maintain attention and concentration for extended periods, and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at consistent pace without an unreasonable number and length of rest periods, that she is markedly impaired in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to interact appropriately with the general public, her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and her ability to respond appropriately to changes in the work setting, and that she is moderately impaired in her ability to remember locations and work-like procedures, her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, her ability

---

[3] A GAF of **51-60** means moderate symptoms OR moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR, at 34.

to sustain an ordinary routine without special supervision, her ability to work in coordination with and proximity with others without being distracted by them, her ability to accept instructions and respond appropriately to criticism from supervisors, her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, her ability to travel in unfamiliar places or use public transportation, and her ability to set realistic goals or make plans independently of others (Tr. pp. 261-262). Dr. Haag noted that post-traumatic stress syndrome symptoms can decrease and improve for short periods, but that environmental triggers can bring them back with little warning (Tr. p. 262).

At her May 2008 administrative hearing, Stokes testified that she had not worked since March 2005, when she left Proctor and Gamble where she had worked as a security clerk (Tr. pp. 19-23).

Stokes also testified that her worst pain is her sciatic nerve pain that shoots down her legs (Tr. pp. 23-24, 28). Stokes testified that her hips, back, and neck have been injured in three auto accidents, in 1995, 2005, and 2007 (Tr. pp. 24-25).

Stokes testified that she is 5'8" tall, weighs about 150 pounds, is single and lives by herself, still drives, and can read, write, and do basic math (Tr. pp. 25-26). Stokes testified that some days she cannot do housework (Tr. p. 26), she can take care of her personal needs, she cooks her own meals sometimes, but her

11

mother cooks for her when she is bedridden, and sometimes she can do her own grocery shopping, while her mother helps her other times (Tr. p. 27).

Stokes testified that she does not like crowds, she cannot stand very long without some kind of support, she drops things, and she is not sure how much weight she can lift, but admitted she can pick up a gallon of milk (Tr. p. 30).

Stokes testified that she is supposed to start treatment for her hepatitis C in July 2008, and has to see a psychiatrist while she is on taking that treatment (Tr. p. 30). Stokes testified that her symptoms from hepatitis C include fever, chills, bloating, swelling, difficult bowel movements, and urinary problems (Tr. p. 30). Stokes also testified there are certain foods she cannot eat due to hepatitis C and sometimes she does not have much appetite (Tr. p. 30).

Stokes testified that she is getting three of her medications free because she cannot afford them (Tr. p. 31). Stokes testified she is currently taking Pepcid, Requip, Xanax (which her mother pays for), and Abilify (which she will begin receiving free from the manufacturer) (Tr. pp. 31-32).

The VE testified that Stokes' past work as a shipping/ receiving clerk at the hardware store was medium level, skilled (SVP 5) (DOC 222.387-050) (Tr. p. 33), and her past work as a security clerk at Proctor and Gamble was sedentary, semi-skilled

(SVP 3) (DOC 205.362-022) (Tr. p. 34).

The ALJ posed a hypothetical question involving a 47 year old person with a high school education and Stokes' past relevant work experience, who can perform no greater than sedentary level work, can frequently balance, can occasionally stoop, crouch, crawl, and kneel, but can never climb ladders, can occasionally climb stairs, has a moderate limitation in her ability to understand, remember, and carry out detailed instructions, a moderate limitation on the ability to maintain attention and concentration, and a moderate limitation on the ability to interact with the public appropriately (Tr. p. 34).  The VE testified that such a person could perform her past relevant work as a security clerk (Tr. p. 34).

For the second hypothetical, the ALJ modified the first hypothetical question to include the additional limitations of frequently grasp and finger, cannot reach overhead, and a moderate limitation in the ability to understand, remember, and carry out detailed instructions (Tr. pp. 34-35).  The ALJ testified that such a person can still work as a security clerk (Tr. p. 35).

For the third hypothetical question, the ALJ modified the second hypothetical to include marked (rather than moderate) difficulties maintaining concentration and persistence (Tr. p. 35). The VE testified there were no jobs such a person would be able to perform (Tr. p. 35).

Stokes' attorney modified the ALJ's second hypothetical by

13

adding a marked difficulties interacting with the general public
and co-workers (Tr. p. 36). The VE testified that such a person
would not be able to perform Stokes' past relevant work, but could
do work involving telephone contact only, such as industrial order
clerk (Tr. p. 36).

Stokes' attorney further modified the ALJ's second
hypothetical to add a limitation involving stress, so any job must
be low stress and have no deadlines (Tr. p. 36). The VE responded
there would not be any "no stress" jobs for such a person (Tr. pp.
36-37). The VE further responded there would not be any "low
stress" jobs available, either, defining "low stress" as an
inability to handle "substantial stress" or a marked difficulty in
handling stress (Tr. p. 37).

<u>ALJ's Findings and Conclusion</u>

To determine disability, the ALJ applied the sequential
process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R.
§416.920(a). The sequential process required the ALJ to determine
whether Stokes (1) is presently working; (2) has a severe
impairment; (3) has an impairment listed in or medically equivalent
to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4)
is unable to do the kind of work she did in the past; and (5) can
perform any other type of work. If it is determined at any step of
that process that a claimant is or is not disabled, the sequential
process ends. A finding that a claimant is disabled or is not

disabled at any point in the five-step review is conclusive and terminates the analysis.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Stokes has not engaged in substantial gainful activity since March 28, 2005, and that she has severe impairments of hepatitis C, degenerative disc disease of the cervical spine, status post fractured left femur, anxiety, and depression, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 11).  The ALJ further found that Stokes has the residual functional capacity to lift/carry ten pounds occasionally, walk/stand two hours in an eight hour day, sit eight hours in an eight hour day, cannot reach overhead, can frequently grasp with her hands, and has moderate difficulties dealing with detailed instructions, maintaining attention and concentration, and

interacting appropriately with the public (Tr. p. 12).  The ALJ then found that, as of August 8, 2008, Stokes was still able to perform her past relevant work as a security clerk (Tr. p. 15). The sequential analysis thus ended at Step 4, with a finding that Stokes was not disabled (Tr. p. 15).

<u>Law and Analysis</u>

1.

Stokes contends the ALJ erred in failing to accord proper weight to the opinions of the treating and examining physicians, resulting in a residual functional capacity assessment that was unsupported by substantial evidence.  First, Stokes argues that her past work as a security clerk, as she performed it, was not sedentary work.

Initially, the burden is on the claimant to demonstrate that she cannot perform her previous work, that she is unable to engage in substantial employment, and that she meets the duration requirement.  <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987).  It is only if the claimant proves that she is unable to engage in her past relevant work (Step 4) that the burden of proof shifts to the Commissioner to show that the claimant is able to perform some other type of substantial work in the economy (Step 5).  <u>Greenspan v. Shalala</u>, 38 F.3d 232 (5th Cir. 1994); <u>Scott v. Heckler</u>, 770 F.2d 482, 484 (5th Cir. 1985); <u>Ferguson v. Schweiker</u>, 641 F.2d 243, 246 (5th Cir. 1981).

In this case, the ALJ's finding that Stokes can perform her past relevant work indicates the ALJ's conclusion that Stokes did not meet her burden of proving that she cannot return to such work. In order to determine that Stokes can perform her former work at Proctor & Gamble, the ALJ was required to directly compare Stokes' remaining functional capacities with the actual physical and mental demands of her previous work.  He must make clear factual findings on that issue.  The ALJ may not rely on generic classifications of previous jobs.  Latham v. Shalala, 36 F.3d 482, 484 (5th Cir. 1994).

The VE characterized Stokes' past relevant work at Proctor & Gamble as a "security clerk," which is sedentary work listed in the Dictionary of Occupational Titles ("DICOT") as No. 205.362-022, also known as "identification clerk."  That job is described in DICOT as follows:

> "Compiles and records personal data about civilian workers, vendors, contractors, military personnel, and dependants of military personnel at defense installation and prepares badges, passes, and identification cards. Interviews applicants to obtain and verify information, such as name, date or birth, physical description, and type of security clearance held.  Corresponds with law enforcement officials, previous employers, and other references to obtain applicant's social, moral, and political background for use by department in determining employment acceptability. Photographs new workers, using automatic identification camera. May fingerprint workers and keep other supplemental identification systems.  May keep records of badges issued, lost, and reissued.  May issue temporary identification badges to visitors."

In her Work History Report (Tr. p. 122), Stokes described her

17

work at Proctor and Gamble as follows:

> "Began day picking up and cleaning job sites then went to night monitoring 2 companies' supplies for Tru-Cory [sp] at Proctor & Gamble."

Stokes further described her job at Proctor and Gamble as a constant combination of walking, standing, sitting, climbing, kneeling, crouching, crawling, reaching, handling, grabbing or grasping big objects, and writing, typing or handling small objects (Tr. p. 122). Stokes also stated that she lifted and carried "trash off the ground to reports of shift activities-on" (Tr. p. 122). Stokes stated in her work history report that the heaviest weight she lifted at Proctor and Gamble was 100 pound pallets, and that she frequently lifted up to 50 pounds (Tr. p. 122). At her hearing, Stokes testified that the "monitored electrical and pipe supplies for Proctor and Gamble during the construction of a power plant." Stokes further stated that she was there

> "more or less to make sure that they [people] picked up what they were to pick up, it was signed for an[d] authorized so that they -- we could get reimbursed back from -- on them; if not -- it was an odd way that they set it up there, but it was to keep more or less the building department from having problems charging the clients for parts and also to keep theft down as well. I think that was the key part of it. ...Well, the stock and supplies would already be there. What we'd have to do is make sure during our shift if an employee through the plant side came for parts, that they had authorization, a purchase order number. They couldn't just walk in and walk out and my job was to monitor the two suppliers that were supplying for the contractor to make sure that this happened" (Tr. p. 21).

Stokes also testified that her job was primarily "[t]o make sure

18

the paperwork was done and had everyone sign they were authorized a purchase order number before they left the lot."   Stokes agreed that her job was "tracking paperwork.. making sure that the paperwork matched the actual material that was leaving" (Tr. p. 22).  Stokes testified there was a security gate, but she was not responsible for guarding the gate because other employees were there to make sure that people coming and going were authorised (Tr. p. 22).

The VE stated that Stokes' job was "security" (Tr. p. 22), while Stokes' attorney stated the job was more clerical (Tr. p. 22).  The VE finally decided she was a "security clerk" instead of a "security guard" (Tr. p. 23).

It appears that Stokes' job was mischaracterized by the VE and the ALJ as a "security clerk."   The description in DICOT of "security clerk," or "identification clerk," bears no similarity to the job described by Stokes.  Stokes's work at Proctor and Gamble clearly was not as a "security clerk."   Therefore, the ALJ's determination that Stokes can perform her past relevant work as a security clerk, as described in DICOT, is not supported by substantial evidence.

However, there is insufficient evidence in the record to determine which DOT job description best fits Stokes' past work at Proctor & Gamble.  This issue will require further development on remand.  Compare, <u>Stubblefield v. Chater</u>, 105 F.3d 670, *4 (10th

Cir. 1997).

2.

Stokes also contends the ALJ erred in finding that Stokes has the residual functional capacity to lift/carry ten pounds occasionally, walk/stand two hours and sit eight hours in an eight hour day, cannot reach overhead, can frequently grasp with her hands, and has moderate difficulties dealing with detailed instructions, maintaining attention and concentration, and interacting appropriately with the public (Tr. p. 12).

Stokes contends that, although the ALJ stated he adopted Dr. DeLapp's residual functional capacity assessment (Tr. p. 13), he omitted Dr. DeLapp's limitations of only occasionally lift/carry up to ten pounds, never reach overhead with bilateral hands, and never balance, stoop, kneel, crouch or crawl from his residual functional capacity assessment (Tr. p. 12), and failed to include those limitations in his hypothetical questions to the VE (Tr. pp. 34-35).[4]  It is noted that, in his opinion, the ALJ included no reaching overhead and no lifting/carrying over ten pounds occasionally, but omitted Dr. DeLapp's postural limitations (Tr. p. 12).

Since the ALJ specifically stated he was adopting Dr. DeLapp's

---

[4] It is noted that the job of "identification clerk" requires frequent (1/3 to 2/3 of the time) reaching, but it is not specified whether any of the reaching is overhead.  DICOT, 205.362-022, "Identification Clerk."

20

opinion as to Stokes' physical limitations (Tr. p. 13), his intent was clear.  The omission of some of Dr. DeLapp's limitations from the hypotheticals to the VE, as well as from the ALJ's opinion, was obviously an error.

Therefore, the hypothetical to the VE was incorrect, based on the ALJ's statement that he was adopting Dr. DeLapp's residual functional capacity assessment of Stoke's physical abilities, and should have included all of the limitations listed by Dr. DeLapp. Since th ALJ's hypothetical to the VE was deficient, substantial evidence does not support the ALJ's finding that Stokes' can perform her past relevant work.

3.

Stokes also contends the ALJ erred in relying on Dr. Quillin's 2006 mental status evaluation instead of Dr. Haag's May 2008 mental evaluation.  The ALJ  stated that he rejected Dr. Haag's opinion as to Stokes' mental residual functional capacity because there was no evidence to support Dr. Haag's findings that Stokes has mental difficulties with activities of daily living or difficulties with social interaction (other than her testimony that she does not like crowds), and noted that Stokes has never been hospitalized for mental problems (Tr. p. 15).

Generally, the opinion of a treating physician deserves to be given greater weight than that of a non-treating or consulting physician.  Carry v. Heckler, 750 F.2d 479, 484 (5th Cir. 1985).

21

However, the weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. Elzy v. Railroad Retirement Board, 782 F.2d 1223, 1225 (5th Cir. 1986); Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983). Also, Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981). An ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001), citing Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

The ALJ's statement that there is no evidence to support Dr. Haag's opinion, that Stokes has mental difficulties with social interaction or activities of daily living, is incorrect. In 2006, Dr. Quillin's one-time evaluation concluded (Tr. pp. 165-166) that Stokes's "Social interaction is constricted. ...This claimant's psychologic condition is substantially impaired and will significantly limit her ability to handle common stressors and also complicate social function. ...Her prognosis is poor." In 2007, Dr. Doolin found, in her one-time evaluation, that Stokes has a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. p. 211), and moderate

limitations in the ability to understand and remember detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to interact appropriately with the general public (Tr. pp. 215-216).  In May 2008, Dr. Haag, the only psychologist who treated Stokes, found that Stokes is extremely impaired in her ability to maintain attention and concentration for extended periods and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at consistent pace without an unreasonable number and length of rest periods; that she *is markedly impaired in* her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, *her ability to interact appropriately with the general public*, her ability to get along with coworker or peers without distracting them or exhibiting behavioral extremes, and her ability to respond appropriately to changes in the work setting; and that she *is moderately impaired* in her ability to remember locations and work-like procedures, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, her ability to sustain an ordinary routine without special supervision, her ability to work in coordination with and proximity with others without being distracted by them, her ability to accept instructions and respond appropriately to criticism from supervisors, *her ability to*

23

*maintain socially appropriate behavior* and to adhere to basic standards of neatness and cleanliness, her ability to travel in unfamiliar places or use public transportation, and her ability to set realistic goals or make plans independently of others (Tr. pp. 261-262).

Since both Dr. Quillin and Dr. Doolin, as well as Dr. Haag, found that Stokes has difficulties with social interaction and has some restrictions in her activities of daily living, the ALJ erred in finding there was no medical evidence of such difficulties. Therefore, substantial evidence does not support the ALJ's findings as to Stokes' mental residual functional capacity.

To the extent that the parties argue the ALJ incorrectly defined "moderate limitations" in his hypothetical questions to the VE, that dispute may be resolved on remand.[5]

4.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Stokes to a decision in her favor based upon the existing record.  The record is simply inconclusive as to whether Stokes can perform her past relevant

---

[5] It is noted that, while plaintiff appears to contend the ALJ's definition of  moderate limitation did not comport with the medical evidence, the Commissioner argues the ALJ's definition comports with the Social Security regulations and the Program Operations Manual.  Obviously, the parties are not arguing about the same thing.

work and as to whether there are any jobs existing in sufficient numbers in the national economy which Stokes can perform, given her true impairments.  Therefore, Stokes' case should be remanded to the Commissioner for further proceedings.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Stokes' case be REMANDED to the Commissioner for further proceedings consistent with the view expressed herein.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 21st day of October, 2009.


JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE